# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ERIC C. HAERTLE,

                Plaintiff,

      v.                            Case No. 14-CV-1347

BRENNAN INVESTMENT GROUP, LLC
and BIG ACQUISITIONS LLC,

                Defendants.

# DECISION AND ORDER

### Factual Background

In 2007 plaintiff Eric Haertle became the chief operating officer of his family's medical supply manufacturing business, H&P Industries, Inc. (ECF No. 66, ¶ 1.) Haertle's two siblings also worked at H&P. David Haertle was the chief executive officer and Donna Petroff was the chief financial officer. (ECF No. 66, ¶ 3.) In January of 2011 the United States Food and Drug Administration found certain alcohol wipes manufactured by H&P and a related company, Triad Group, Inc., to be contaminated with bacteria. (ECF No. 66, ¶ 4.) The companies recalled the product, but the fallout shut both businesses down and both filed for Chapter 11 bankruptcy protection on August 9, 2012. (ECF No. 66, ¶ 5.) The bankruptcy proceedings of Triad Group and

H&P were consolidated and jointly administered (together with a third company, Triad Pharmaceuticals, Inc.) as the "Triad Bankruptcy case." (ECF No. 66, ¶ 6.)

The Haertle siblings developed a business plan for Triad to emerge from bankruptcy with an infusion of approximately $2 million in financing to fund operations. (ECF No. 66, ¶ 7.) The Haertles negotiated with the bankruptcy creditors' committee to pay their unsecured creditors with future profits from the business after its reorganization. (ECF No. 71, ¶ 3.) The bankruptcy plan included a proposal that H&P's assets—the most valuable of which was the Triad/H&P manufacturing facility located in Hartland, Wisconsin, hereinafter referred to as the "Hartland Property"—be sold at an auction, where the Haertles would be the "stalking horse bidder"[1] at $6.5 million. (ECF No. 71, ¶¶ 5, 8.)

To finance the $6.5 million "stalking horse" bid proposal, Eric Haertle reached out to real estate broker Sam Dickman, Jr. to find parties interested in purchasing the Hartland Property. (ECF Nos. 66, ¶8; 71, ¶ 14.) Dickman contacted defendant Brennan Investment Group, LLC (hereinafter "Brennan") regarding its interest in the Hartland Property. (ECF No. 66, ¶ 10.)

---

[1] A "stalking horse" is "[s]omething used to cover one's true purpose; a decoy." *State v. Hajicek*, 2001 WI 3, ¶ 22, 240 Wis. 2d 349, 620 N.W.2d 781; *see also In re SpecialityChem Products Corp.*, 372 B.R. 434, 436 (E.D. Wis. 2007) ("In the bankruptcy context, a stalking horse bidder reaches an agreement with the debtor-in-possession to purchase assets prior to the court-supervised auction of those assets. Because this bid will be exposed to higher and better bids at auction, the agreement typically provides for a break-up fee to compensate the stalking horse bidder for setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement.")

2

On October 29, 2013, Scott McKibben—Brennan's managing principal—sent Dickman a "Letter of Intent" outlining certain terms under which Brennan would negotiate a mutually acceptable Purchase and Sale Agreement for Brennan's acquisition of the Hartland Property. (ECF Nos. 66, ¶ 10; 67-1.) The Letter of Intent stated:

> We are pleased to provide you this letter of intent, outlining certain terms under which the Purchaser intends to negotiate a mutually acceptable Purchase and Sale Agreement ("Purchase and Sale Agreement") for Purchaser's acquisition of ownership of the Property from its current owner of record. This letter is in no way intended to be a complete or definitive statement of all the terms and conditions of the proposed transaction, but remains subject to the negotiation of a definitive Purchase and Sale Agreement.

(ECF No. 66, ¶ 11.) The Letter of Intent also contained a provision entitled "Non-Binding Nature" that stated that "[n]othing contained herein shall create any obligation on the part of any person or entity to either approve the terms of the proposed transaction or enter into a Purchase and Sale Agreement" and that "no party will be legally bound in any manner unless and until a formal, written Purchase and Sale Agreement has been prepared, executed and delivered by all parties thereto[.]" (ECF No. 66, ¶ 12.)

The Letter of Intent outlined a potential deal for the Hartland Property, which would be a "sale leaseback": the Haertles would sell the property to Brennan, which would then lease the property back to the Haertles as a tenant (enabling the Haertles to re-start their manufacturing business from the same building). (ECF No. 67-1.) The purchase price would be $7,000,000, with the Purchaser and Seller entering into a seven-

year triple net lease for 100,000 square feet with an initial base rent of $450,000 per year with three percent annual escalations. (ECF Nos. 66, ¶ 13, 67-1, 71, ¶ 25.) The Letter of Intent was signed by Brennan (by McKibben as Managing Principal) as the "Purchaser." (ECF Nos. 67-1; 71, ¶ 25.) The "seller" signature block was left empty and both parties agree that Eric Haertle[2] never signed it and never agreed to either a $7 million purchase price or a seven-year triple net lease for 100,000 square feet. (ECF No. 70, ¶¶ 14-15.)

The parties thereafter negotiated the purchase of the Hartland Property. (ECF No. 71, ¶ 33.) On November 22, 2013, McKibben sent an e-mail to Dickman detailing two separate Brennan proposals for the purchase of the property:

> Option A: Seller leases back 135k sf at $4.50 absolute net, 7 year term, 3% bumps, price is $7.5 million.
> Option B: Seller leases entire building at $3.25 absolute net, 15 year term, 3% bumps, they keep rent from existing tenant through term, $8.6 million price, tenant purchase option after 10 years will be $15 million.
> Both options will require some security deposit that we will need to address more in diligence. In Option B, we would want a bigger SD holdback.

(ECF Nos. 71, ¶ 33; 68-2.) Under Option A Brennan would keep the lease payment of tenant PM Plastics (another tenant in the Hartland Property), while under Option B Haertle would keep the PM Plastics lease payment. (ECF No. 71, ¶ 35.) Both options were communicated to Haertle on or around November 25, 2013. (ECF No. 71, ¶ 34.)

---

[2] It is unclear exactly when Eric Haertle's two siblings decided not to be involved with the business going forward. (See ECF No. 68-1 at 54.) However, Eric Haertle was the only one who negotiated with Brennan over the Hartland Property. All references to "Haertle" that appear below therefore refer to plaintiff Eric Haertle alone.

4

Two days later, on November 27, 2013, Haertle e-mailed Dickman:

> This is what I am thinking:
>
> $8.2 M Sale Price
> 5 year lease NNN @ $3.50/sq 3% bumps
> Buyback option during the lease at $9-10M
> 1st right to assume PM's leased space
>
> I have thoughts on Option B but am leaning towards A.

(ECF No. 74-19 at 7.) Upon learning of Haertle's terms, McKibben told Dickman, "I don't think it will work—that is a huge departure from our proposal." (ECF No. 74-19 at 6.)

On December 2, 2013, McKibben responded to Haertle's proposal with an e-mail to Dickman containing another proposal about which he said there was "no room for negotiation":

> $8.5 million (but when I add broker fee of 425k, loan fees of 75k, deal fee of 85k and other costs we are at 9.2M). $3.25 net on entire building—10 year lease.
>
> Purchase option at the end of 5 year (1 time right, not ongoing because it makes debt too tricky), $11.5 million….[T]his is the absolute best I can do on this deal and it is subject to me being able to procure 65% debt.
>
> That is the deal we will be interested in.

(ECF 74-27 at 2.) Haertle claims that sometime in December he told Dickman that he would accept this modified, $8.5 million Option B if Brennan wanted it, "although I preferred the lower Option A." (ECF No. 72, ¶ 17.) Despite this alleged "acceptance," Haertle still believed Brennan would revert to Option A. (ECF No. 71, ¶ 45.) Apparently

no documents evidence Haertle's acceptance of Brennan's offer, nor is there any evidence that anyone told *Brennan* that Haertle would accept Brennan's offer.

The bankruptcy creditors' committee in Triad's Chapter 11 proceeding requested verification that Haertle would be able to fund the reorganization plan that he had submitted. (ECF No. 71, ¶ 43.) To do so, counsel for Haertle contacted McKibben to ask for Brennan's sign-off on a document entitled "Plan Funding" (the "Plan Funding Document") to show that Haertle had a reputable financier in place. (ECF No. 74-1.) In relevant part the Plan Funding Document stated:

> Brennan Investment Group through BIG Acquisitions LLC ("Investor") intends to provide funding into the Plan proposed by Triad Group, Inc., H & P Industries, Inc. and Triad Pharmaceuticals, Inc. (collectively, the "Debtors") in an amount of six million five hundred thousand dollars ($6,500,000) in order for the 'Haertles' to obtain substantially all of the Debtors' assets under the Second Amended Joint Plan of Reorganization… on the 'Financing Terms' stated below.

(ECF No. 67-2.) Relevant here, "Financing Term" #7 stated, "Investor's [sic] providing funds is dependent upon it and the Haertles finalizing terms of instruments such as a lease to consummate the transaction." (ECF No. 66, ¶ 19.) The "Effective Date" of the Plan Funding Document – the date on which the closing of the sale would need to occur—was February 15, 2014. (*Id*.)

McKibben signed the Plan Funding Document on December 11, 2013, under a signature block that listed "BIG Acquisitions, LLC" as the "Investor." (ECF No. 67-2.) The document was not signed by Haertle or any representative of the seller. (*Id*.) The

Effective Date was later changed to March 31, 2014, in a second, otherwise identical Plan Funding Document, again signed only by McKibben. (ECF Nos. 66, ¶ 20 and 67-3.)

On December 16, 2013, Dickman sent an e-mail to McKibben stating that "[Eric Haertle] would like a PSA [Purchase and Sale Agreement]." (ECF No. 74-29.) McKibben e-mailed Brennan's in-house lawyer, Sam Mandarino, on December 23, 2013, and provided the following terms: "$8.5 million, $3.25/sf absolute net, 10 year, 3% annual increases, end of year 5, purchase option $11.4 million." (ECF No. 74-30.) Mandarino understood that he was to place these deal terms into a written draft of a Lease and a Purchase and Sale Agreement. (ECF No. 74-58 at 13-14.) The purchase option was dropped another $100,000, to $11.3 million, in Brennan's draft of the Lease. (ECF No. 68-6 at 26.)

Brennan forwarded its drafts of the Lease and the Purchase and Sale Agreement to Haertle (through Dickman's company) on January 27, 2014. (ECF No. 68-3.) Nearly a month later, on February 24, 2014, Haertle sent a revised Lease back to Dickman's company, which forwarded Haertle's revisions to Brennan. (ECF No. 66, ¶ 23.) Haertle's revisions altered the Lease term from ten years to seven years; altered the rent schedule from approximately $954,000 in year two with three percent annual increases (resulting in rent exceeding $1 million by year four) to approximately $926,000 in year two and a flat rate of $997,500 in years three through seven; changed the purchase option time period from after year five to any time after the Lease went into effect; reduced the

tenant's purchase option from $11.3 million to $10.5 million; removed Brennan's 3.5% management fee; and removed a disclaimer of purchase rights (i.e., right of first refusal, right of first offer, purchase option, or similar rights). (ECF No. 66, ¶¶ 25, 26, 27, 28, 30, 31.)

McKibben was surprised by the extent of Haertle's proposed changes to the Lease. (ECF No. 66, ¶ 32.) Haertle characterized the changes as "looking to see if he could improve upon the agreed upon deal as had been done with lowering the option price from $11.5 million to $11.3 million, and revert back to the lower priced deal in Option A." (ECF No. 71, ¶ 83.) Haertle admits that as of mid-February "which option we were leaning towards was still up in the air." (ECF No. 68-1 at 36.) The parties thereafter discussed the alterations. (*See* ECF No. 74-37.)

On February 27, 2014, Haertle's counsel e-mailed Brennan the timeline of the Chapter 11 bankruptcy proceedings. (ECF Nos. 74-26; 74-27). The timeline stated that Haertle would need to submit a bid on February 28, 2014, and that a realistic closing date would be April 15, 2014. (ECF Nos. 74-17; 74-18.) Haertle contends that on the morning of February 28, 2014, he called Dickman and "…confirmed that all terms requested by Brennan in the Draft Lease, as slightly modified by the parties on February 24, 2014, were acceptable." (ECF No. 71, ¶ 86.) Dickman has no recollection of Haertle ever accepting all of Brennan's terms "or anything like that." (ECF No. 68-13 at 27.)

There is no evidence that either Haertle or Dickman ever communicated to anyone at Brennan that Haertle had accepted Brennan's proposed Lease.

On February 28, 2014, Haertle signed and submitted to the designated sales agent for the bankruptcy case a $6,500,000 bid (including a $325,000 deposit) for the assets of the companies involved in the Triad bankruptcy case. (ECF No. 68-7.) Also that day McKibben contacted a title company in order to complete an escrow arrangement on the Hartland Property transaction. (ECF No. 74-38.) However, in an e-mail to McKibben that same day Mandarino stated, "Perhaps we should hold on the escrow deposit." (ECF No. 74-40.)

On March 4, Haertle sent a revised version of Brennan's draft Purchase and Sale Agreement to Brennan. (ECF No. 66, ¶ 37.) The revised agreement altered several terms from Brennan's draft, including 1) changing the "seller" from Triad Group, Inc. to Eric Haertle; 2) adding a provision stating Brennan accepted an underlying lease with a third-party; 3) limiting Brennan's remedy in the event Haertle was not the "Ultimate Purchaser" under the Plan Funding Document; 4) changing from $100,000 to $30,000 the maximum amount of expenses to be reimbursed in the event Haertle did not win the auction; 5) removing a condition precedent to Brennan's obligations that "no material adverse change shall have occurred in the financial condition of the tenant"; and 6) adding a provision prohibiting Brennan from making any claim against Haertle for "any damages whatsoever" in the event of default. (ECF No. 66, ¶ 38, 39, 40, 41, 42, 43.)

Haertle disputes the characterization of these changes as a counteroffer, arguing that the draft Purchase and Sale Agreement that Brennan proposed was merely a "first stab" at an agreement. (ECF Nos. 71, ¶ 74; 74-58, at 14.) Haertle claims that his revisions were made to make the Purchase and Sale Agreement consistent with the bankruptcy sale procedures. (ECF No. 71, ¶ 89.)

On March 4, 2014, Brennan's newly retained bankruptcy counsel left a voicemail message with Haertle's counsel stating, in relevant part,

> The Brennan folks, whom have asked us to assist them . . . have decided to go in a different direction and make a bid for the assets directly as opposed to supporting an equity [infusion]. So, that is what they are currently planning to do. They are very eager to continue discussing a lease of the premises with the Haertles, if Brennan is the, in fact the winning bidder for the assets… ."

(ECF No. 74-57 at 34.) Counsel for Haertle made an effort to propose a new, alternative arrangement on March 5, 2014, but in a March 7 phone call between Haertle, Brennan's managing principals (McKibben and Mike Brennan), and Dickman the parties were not able to reach an agreement on any financing or lease deal. (ECF Nos. 68-11; 71, ¶ 94.) It is undisputed that the parties never executed any version of the Lease or the Purchase and Sale Agreement. (ECF No. 66, ¶ 58.) Because no financing deal could be reached, Haertle did not participate in the bankruptcy auction.

Despite indicating that it may do so, Brennan never submitted a bid (independently or otherwise) for the bankruptcy assets. (ECF No. 66, ¶¶ 82-83.) A company called Medline Industries, Inc. submitted a winning bid of $7.1 million for the

Triad Group's assets. (ECF No. 66, ¶ 59.) Haertle was refunded his $325,000 bid deposit. (ECF No. 66, ¶ 60.)

This litigation ensued. Haertle's complaint alleges eight causes of action against Brennan. The first four are contract-based claims: 1) breach of contract; 2) breach of the duty of good faith and fair dealing; 3) breach of the implied promise to refrain from hindering or obstructing performance of contract; and 4) repudiation of contract. (ECF No. 1.) The remaining four claims are plead in the alternative: 5) promissory estoppel; 6) tortious interference of [sic] contract by Brennan; 7) punitive damages; and 8) piercing BIG Acquisitions, LLC's corporate veil. (*Id*.) The defendants, Brennan and BIG Acquisitions, LLC, move for summary judgment on all eight causes of action. (ECF No. 63.) The motion, being fully briefed, is now ready for resolution. (ECF Nos. 64, 69, 81).

### Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit" under the applicable substantive law and a dispute is "genuine" if a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the

[summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007), "the nonmovant must produce sufficient admissible evidence, taken in the light most favorable to it, to return a jury verdict in its favor" to survive summary judgment. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012) (citing *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 690-91 (7th Cir. 2010)).

**Analysis**

**A. Haertle's Contract-Based Claims**

Defendants move for summary judgment on Haertle's first four claims because all of them require the existence of a contract. And, defendants claim, the parties never entered into a contract.

Neither party disputes that Wisconsin substantive contract law applies. *See Henderson v. U.S. Bank, N.A.*, 615 F. Supp. 2d 804, 808 (E.D. Wis. 2009) ("In Wisconsin… the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of greater significance.") (internal citations omitted). Under Wisconsin law, "a breach of contract claim has three elements: (1) a valid contract; (2) a violation or breach of the terms of that contract; and (3) damages." *Schuetta v. Aurora Nat. Life Assur. Co.*, 27 F. Supp. 3d 949, 957 (E.D. Wis. 2014) (citing *Steele v. Pacesetter Motor Cars, Inc.*, 2003 WI App 242, ¶ 10, 267 Wis. 2d 873, 672 N.W.2d 141). Haertle's other three contract-based claims all also require the existence of a contract. *See Tang v. C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶ 41, 301 Wis. 2d 752, 781, 734 N.W.2d 169, 183 ("A duty of good

faith *is implied in every contract*, and is a guarantee by each party that he or she will not intentionally and purposely do anything to prevent the other party from carrying out his or her part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract") (emphasis added); Wis. JI-Civil 3060 (1993) ("If one person *enters into a contract* with another, there is an implied promise by each that each person will do nothing to hinder or obstruct performance by the other.") (emphasis added); *Tilstra v. Boumatic, LLC*, 1 F. Supp. 3d 900, 912 (W.D. Wis. 2014) ("In order to constitute an anticipatory repudiation of a contract [under Wisconsin law], there must be a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it *in the contract* arrives.") (citing *Wisconsin Dairy Fresh, Inc. v. Steel & Tube Products Co.*, 20 Wis. 2d 415, 427, 122 N.W.2d 361, 367 (1963)) (emphasis added).

Defendants set forth three arguments supporting their position that the parties never entered into a contract.

### 1. No meeting of the minds on the essential terms

It is undisputed that there is no written agreement signed by both parties. Defendants argue that there was no meeting of the minds between the parties on the essential terms of the proposed financing deal. Even the most concrete evidence of an agreement—the Plan Funding Document—was nothing more than an "agreement to

agree" which is unenforceable under Wisconsin law. *Denil v. DeBoer, Inc.*, 650 F.3d 635, 638 (7th Cir. 2011) (Wisconsin law).

Haertle responds that discussions over several months of negotiation show that the terms were "sufficiently clear so as to form a contract between the parties." He contends that all essential deal points had already been agreed to by the time the Plan Funding Document was drafted such that the contingent language of "Financing Term #7" did not render it an "agreement to agree." Even if some terms were still "up in the air," contracts may be formed between parties even though they require details to be worked out. *Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992) (applying Illinois law).

In Wisconsin, contracts must be sufficiently definite as to the parties' basic commitments and obligations to be enforceable. *Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 178, 557 N.W.2d 67 (1996). "Courts often describe the definiteness requirement as mutual assent, or 'meeting of the minds.'" *Id* (citing Wis JI-Civil 3010; 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 4.13, at 634-637 (Joseph M. Perillo, revised ed. 1993)). "To constitute an acceptance and the creation of a contract there must be a meeting of the minds upon all essential terms thereof." *Todorovich v. Kinnickinnic Mut. Loan & Bldg. Ass'n*, 238 Wis. 39, 42, 298 N.W. 226 (1941). That said, "meeting of the minds" or "definiteness" is an objective standard; courts look to the parties' conduct and practical interpretation to discern their intent. *Metro. Ventures, LLC*

*v. GEA Assocs.*, 2006 WI 71, ¶ 24, 291 Wis. 2d 393, 409-10, 717 N.W.2d 58, 66-67. "The question is whether there is sufficient evidence to ascertain the intent of the parties" when examining "both the wording of the contract as well as the surrounding circumstances… ." *Id.* at ¶ 25.

Ascertaining the intent of the parties begins by examining what they have placed in writing. *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 15, 676 N.W.2d 426, 433. There are two documents signed by Brennan's agent, Scott McKibben: (1) the October 29, 2013 Letter of Intent and (2) the Plan Funding Documents (dated December 11, 2013 and January 14, 2014). The Letter of Intent is titled "Letter of Intent to purchase and leaseback [the Hartland Property]" and, of relevance here, had a "Non-binding nature" paragraph which stated in part:

> [I]t is understood that no party will be legally bound in any manner unless and until a formal, written Purchase and Sale Agreement has been prepared, executed and delivered by all parties thereto;

(ECF Nos. 66, ¶ 12; 67-1.) The Letter of Intent also contained a "Lease Contingency" outlining some terms of a lease (i.e., rental amount and lease term) that both parties acknowledge were never agreed to. (ECF Nos. 66, ¶ 15; 70, ¶ 15.) The Letter of Intent reveals that, from the start, Brennan intended that its purchase of the Hartland Property would include a leaseback as the means through which Brennan would recuperate its investment and that Brennan would not be bound by the Letter of Intent "unless and

until a formal, written Purchase and Sale Agreement has been prepared, executed and delivered by all parties thereto[.]" (ECF No. 67-1 at 2.)

As set forth by Brennan in the Plan Funding Document, Brennan (through BIG Acquisitions, LLC) would provide Haertle $6,500,000 in financing in anticipation of its purchase of the Hartland Property as long as certain conditions were met. (ECF Nos. 67-2; 67-3.) Financial Term #7 specifically stated that the obligation to provide funds "is dependent upon [the investors] and the Haertles finalizing terms of instruments such as a lease to consummate the transaction." (ECF No. 67-2 at 2.) Financial Term #7 does not specify the lease term, the amount of rent, the rent schedule, whether the tenant shall have a purchase option, or any further details regarding the lease structure. (ECF No. 67-2 at 2.)

Since the Plan Funding Document does not set forth the details of the Lease or of a Purchase and Sale Agreement, Haertle asks the court to examine the negotiation record to find the Lease and Purchase and Sale Agreement terms to which the parties agreed. His complaint states that all deal terms were agreed to "by December 11, 2013." (ECF No 1, ¶ 15.) That is the date McKibben executed the Plan Funding Document discussed above.

But Haertle changed the terms of the deal with his revised Lease on February 24, 2014 (*see* ECF No. 68-4 (red-lined version of lease)), and his revised Purchase and Sale Agreement on March 4, 2014. (ECF No. 68-8.) Haertle also admits that as of February 26,

2014, the lease terms were still "up in the air." (ECF No. 68-1 at 36-38.) On this record, then, the following Lease terms appear indeterminate:

i.     Purchase Price

The parties initially discussed two different options for the purchase price ($8.6 million and $7.5 million). (ECF No. 71, ¶ 33.) Although Haertle's complaint states that an $8.5 million purchase price had been agreed to in December, he testified in his deposition that the purchase price was still "up in the air" as of February 26, 2014. (ECF No. 68-1 at 36-37.) Indeed, Haertle's February 24, 2014 revisions to the Lease were his attempt to move the purchase price from $8.5 million to $7.5 million. (ECF No. 71, ¶¶ 83-84.) No subsequent correspondence indicates or confirms that the parties ever agreed on a purchase price.

ii.     Option price

Haertle's complaint also alleges that the parties agreed to a purchase option price of $11.3 million. (ECF No. 1, ¶ 17(g).) That term appears in the draft Lease that Brennan sent to Haertle on January 27, 2014. (ECF No. 74-35 at 33.) There is no evidence that Haertle ever agreed to that price. Indeed, Haertle's revisions to the Lease changed the option price to $10.5 million. (ECF No. 68-5 at 3.) No evidence has been submitted on which a finder of fact could base a conclusion that the parties "agreed" to any particular option price.

### iii.    Option term

Haertle's complaint states that his deal with Brennan would allow him to exercise a purchase option any time after the first five years of the Lease. (ECF No. 1, ¶ 17(g).) Haertle's revisions to the draft Lease, however, allowed Haertle to exercise his purchase option at any time during the Lease. (ECF No. 68-5 at 3.) No evidence has been submitted on which a finder of fact could base a conclusion that the parties "agreed" to any particular option term.

### iv.    Lease Term

Brennan proposed a 10 year lease term in its draft sent to Haertle on January 27, 2014. (ECF No. 74-35 at 3.) And Haertle's complaint alleges that the parties agreed to a ten-year lease term. (ECF No. 1, ¶ 17(g).) However, there is no evidence supporting that allegation. In fact, Haertle responded to Brennan's proposed ten year lease term with a proposal for a seven-year lease. (ECF No. 68-4 at 5.) No evidence has been submitted on which a finder of fact could base a conclusion that the parties agreed to any specific lease term.

### v.    Rent Schedule

Brennan's draft Lease proposed a rent schedule that began at $926,500 for the first year and increased each subsequent year's rent by 3%. (ECF No. 74-35 at 39.) Haertle's revised Lease proposed rent of $926,500 in years one and two and then rent of $997,500 in years three through seven. (ECF No. 68-5 at 13.) Because Haertle changed

18

the lease term from ten years to seven years, Haertle did not propose a rent amount for years seven through ten. (*Id.*) The total difference between Haertle's rent schedule and Brennan's rent schedule amounted to $3,778,418.21. (ECF No. 66, ¶ 70.) No evidence has been submitted on which a finder of fact could base a conclusion that the parties had "agreed" to any particular rent schedule.

### 2. Haertle Never Accepted Brennan's Offer

Haertle claims that he did, in fact, accept Brennan's offer as to all of the above terms. In support, he first argues that his revised Lease and revised Purchase and Sale Agreement were not a "counteroffer." Instead, they were merely an attempt to "see if Brennan would 'revert back' to the $7.5 million financing option from the $8.5 million financing option agreed to… ." (ECF Nos. 69, at 11; 71, ¶ 83.)

A counteroffer is defined as "an offeree's new offer that *varies the terms of the original offer* and that ordinarily rejects and terminates the original offer." BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added). No matter what label he would like to attach to them, Haertle's February 24, 2014 revisions to the draft Lease, and his March 4, 2014 revisions to the draft Purchase and Sale Agreement, constituted a counteroffer that operated to reject Brennan's offer. *Leuchtenberg v. Hoeschler*, 271 Wis. 151, 155, 72 N.W.2d 758 (1955) ("The acceptance of an offer upon terms varying from those of the offer, *however slight*, is a rejection of the offer.") (quoting *Hess v. Holt Lumber Co.*, 175 Wis. 451, 455, 185 N.W. 522, 523 (1921)); *Fricano v. Bank of America NA*, 2016 WI App 11, ¶ 29, 366

Wis. 2d 748, 770, 875 N.W.2d 143 ("A contract is formed when there is a meeting of the minds as to its terms, and an acceptance that varies the terms of the offer constitutes a rejection and a counteroffer."). Haertle's revisions changed the terms of the deal. And not just minor terms. He changed the most important components of the transaction.

As Brennan notes, Haertle's argument ignores "[t]he general rule. . . that, where an offer is made and refused, the transaction is closed and the party refusing cannot by changing his mind create a contract or obligation against the protest of the party making the offer." *Cass v. Haskins*, 154 Wis. 472, 143 N.W. 162 (1913); *NDC, LLC v. Wisconsin Dept. of Transp.*, 2016 WI App 16, ¶ 12, n. 4, 366 Wis. 2d 809, 874 N.W.2d 347 (table) (argument that NDC was entitled to withdraw its rejection with a later acceptance of the original offer lacked merit: "An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention.") (quoting Restatement (Second) of Contracts § 38(1), at 104 (Am. Law Inst. 1981)); 1 WILLISTON ON CONTRACTS § 5.3 (4th ed.) ("When an offer has been rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative… ."). It is well-settled Wisconsin law that, when a purported "acceptance" alters the offer's terms, it operates as a rejection of the offer, and no contract is formed unless the party making the original offer either renews it or agrees to the proposed modifications. *Todorovich v. Kinnickinnic Mut. Loan & Bldg. Ass'n*, 238 Wis. 39, 298 N.W. 226, 227 (1941). Once Haertle rejected Brennan's offer by submitting a revised Lease and a revised Purchase and Sale

Agreement, he no longer had the right to accept Brennan's offer unless Brennan manifested a contrary intention. And there is no evidence that Brennan manifested such a contrary intention.

Anticipating this finding, Haertle posits that Brennan's "good faith obligations" would not allow it to "refuse[] to agree to the original terms when Haertle accepted them[.]" (ECF No. 69 at 13.) Haertle cites *Bear Development, LLC v. City of Kenosha*, 822 F. Supp. 2d 865 (E.D. Wis. 2011), for the proposition that Brennan's conduct constituted bad faith. In *Bear Development*, the parties had a signed, written contract stating that Bear Development, LLC "shall enter into such [Remediation Contract] as may be required by [the City] and TRC companies." *Id*. at 867. After initially voicing its opposition to the City's draft remediation contract, Bear Development accepted the City's contract by signing and delivering it to the City prior to the deal's deadline. *Id.* at 868. When the City refused to acknowledge the contract, the court held that it had breached the duty of good faith and fair dealing, finding "[p]*arties to a contract have a duty of good faith to each other*" and a party "lacks good faith where it treats a counteroffer as nullifying the original, and then makes no further offer, nor permits the party to accept the original conditions which were presumably agreeable in the first instance." *Id.* at 870-71 (emphasis added).

But unlike the situation in *Bear Development*, Brennan had not entered into a contract with Haertle. Nothing required Brennan to remain in negotiations after Haertle's counteroffer rejected Brennan's offer.

Although there is no evidence that Haertle ever told Brennan that he was accepting Brennan's offer, Haertle argues that he accepted Brennan's offer on February 28, 2014, during a phone call with Sam Dickman. (ECF No. 71, ¶ 86.) Dickman has no recollection of Haertle ever accepting all of Brennan's terms "or anything like that." (ECF No. 68-13 at 27.) Nevertheless, Haertle says that Dickman was acting as an agent of Brennan throughout the transaction and that, by communicating his acceptance to Dickman on February 28, 2014, Haertle effectively communicated his acceptance of Brennan's January 27, 2014 draft Lease to Brennan.

"An agency relationship arises when 'one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 100 (N.D. Ill. 2013) (quoting Restatement (Third) of Agency § 1.01). No evidence exists that Dickman and Brennan entered into an agency relationship with regard to the potential acquisition of the Hartland Property. While Dickman was responsible for fostering communication between the two parties, nothing suggests that Brennan authorized Dickman to accept offers on its behalf. No reasonable finder of fact could conclude that Dickman was

acting as an agent for anyone other than Haertle during the negotiations with Brennan. It was Haertle who brought Dickman into the transaction to help him find someone who could purchase the Hartland Property. Dickman found Brennan, with whom he had worked in the past, but that does not mean that Dickman was at any time acting as Brennan's agent.

In short, no evidence exists that Haertle ever communicated to Brennan that he accepted Brennan's offer. And Haertle cannot use his conversation with Dickman to satisfy the mutual assent necessary to form a contract. Together, the defendants' arguments convince the court that summary judgment is appropriate on Haertle's contract claims.

### 3. Statute of frauds

A second, independent reason exists for granting the defendants' summary judgment motion regarding Haertle's contract claims. The Wisconsin Statute of Frauds, Wis. Stat. § 706.02, requires that a transaction involving an interest in land must be evidenced by a conveyance that "[i]s signed by or on behalf of all parties, if a lease or contract to convey." Wis. Stat. § 706.02(e)(1). "The obvious purpose of requiring the signature of the grantor to appear on the conveyance is to evidence his intent to become bound by the agreement." *Nelson v. Albrechtson*, 93 Wis. 2d 552, 560, 287 N.W.2d 811, 816 (1980); *see also In re Estate of Johnson*, 2006 WI App 19, ¶ 10, 289 Wis. 2d 100, 709 N.W.2d 88 ("[t]he primary purpose of the Statute of Frauds is evidentiary, to require reliable

evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made.").

By the same token, however, the statute "is not intended to give either party a 'technical escape from a fair and definite agreement.'" *In re Couilard*, 486 F.R. 466, 475 (W.D. Wis. 2012) (quoting *Kenner v. Realty & Fin. Co.*, 204 Wis. 575, 236 N.W. 597, 602 (Wis. 1931)). Wis. Stat. § 706.04 allows a court to enforce a transaction that fails to meet one of the formal requirements of Wis. Stat. § 706.02, "provided all of the elements of the transaction are clearly and satisfactorily proved… ." Wis. Stat. § 706.04.

Brennan contends that any contract allegedly formed with Haertle did not comply with the statute of frauds. Haertle responds that the statute of frauds does not require a single document incorporating all of the terms of agreement between the parties as long as the parties' conduct indicates that the transaction is governed by several documents. *See* Wis. Stat. § 706.02(2)(c). He also relies on *Hilkert v. Zimmer*, 90 Wis. 2d 340, 343, 280 N.W. 2d 116, 118 (1979), for the proposition that, where the details of an agreement between the parties are disputed, a court's determination on the effect of the statute of frauds is premature at the summary judgment stage.

In *Hilkert* the question was whether the parties had orally agreed to modify a written conveyance that they had fully executed. The opinion turned on the complexity of oral variations of written contracts. *Id.* at 117-118 ("Whether a written contract can be orally modified cannot be disposed of as easily as the trial court's opinion would

suggest. The subject of the possibility of the oral variation or rescission of written contracts within or partly within the statute of frauds comprises a chapter of more than 50 pages in length in a leading treatise on contracts."). Thus, summary judgment without analysis of the complex rules concerning oral modifications to written agreements was found to be inappropriate. *Id*.

But no complex analysis is necessary here. The issue is whether any of the documents, separately or combined, sufficiently contained all material terms so as to satisfy the formal requirements of Wis. Stat. § 706.02. As discussed above, the parties were still negotiating terms when Brennan pulled out of the transaction. There is no writing, or collection of writings, that provides the evidentiary reliability that the statute of frauds is meant to ensure. Thus, the court further finds that the statute of frauds provides an independent ground for granting Brennan's summary judgment on Haertle's contract related claims.

For the reasons discussed, the court shall **grant** Brennan's motion for summary judgment as to **Counts 1-4** of Haertle's complaint.

### B. Promissory Estoppel

Promissory estoppel in Wisconsin dates back to *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267, 275 (1965), and requires the plaintiff establish the following elements: "(1) the existence of a promise that (2) the promisor reasonably should have expected would induce substantial action or inaction, (3) did induce such

action or inaction, and (4) must be enforced in order to avoid injustice." *Am. Orthodontics Corp. v. Epicor Software Corp.*, 746 F. Supp. 2d 996, 999 (E.D. Wis. 2010). "While the first [three] requirements . . . present issues of fact which ordinarily will be resolved by a jury, the [fourth] requirement, that the remedy can only be invoked where necessary to avoid injustice, is one that involves a policy decision by the court." *Hoffman*, 26 Wis. 2d at 698.

For purposes of promissory estoppel, "[a] promise is a manifestation of intent by the promisor to be bound, and is to be judged by an objective standard." *Major Mat Co. v. Monsanto Co.*, 969 F.2d 579, 583 (7th Cir. 1992). "Whether a reasonable person in the position of the plaintiff would conclude that the defendant's statement was a commitment or a mere prediction is a question of fact for a jury to resolve—unless the court rules that reasonable people could reach only one reasonable conclusion." *Id*.

The promise here, as set forth in Haertle's complaint, is one whereby "Brennan promised to provide financing of $8.5 million to Haertle for the purchase of the Sale Assets." (ECF No. 1, ¶ 49.) The complaint further alleges that Haertle incurred costs pursuing bidding in reliance on Brennan's promise. (ECF No. 1, ¶ 51-52.)

But there is no evidence that Brennan ever made an unconditional promise to provide Haertle with $8.5 million. Both the Letter of Intent and the Plan Funding Document conditioned Brennan's promise to provide funding on the parties entering into a Lease and a Purchase and Sale Agreement. They never did. It was not reasonable

for Haertle to rely on Brennan's conditional offer to provide funding even though the conditions were not satisfied.

The court cannot find that Haertle reasonably relied on a promise that must now be enforced to avoid an injustice. Brennan's motion for summary judgment shall be **granted** with regard to Haertle's claim for promissory estoppel.

### C. Tortious Interference With Contract Claim & Punitive Damages

Brennan also moves for summary judgment on Haertle's sixth cause of action, which alleges tortious interference with contract. Haertle's claim alleges that he and BIG Acquisitions, LLC had a prospective contractual relationship. When Brennan stopped negotiating with Haertle in order to pursue its own purchase of the Hartland Property, Brennan tortiously interfered with the prospective contract that BIG Acquisitions had with Haertle.

Brennan challenges the first element of a tortious interference with contract claim, namely, that "(1) the plaintiff had a contract or prospective contractual relationship with a third party… ." *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1994). It contends that a principal cannot be liable for interfering with a prospective contractual relationship that its agent is negotiating on its behalf, as BIG Acquisitions was doing here.

Haertle contends that there is at least a factual dispute over whether BIG Acquisitions was acting as Brennan's agent during negotiations with Haertle. There

Case 2:14-cv-01347-WED   Filed 03/08/17   Page 27 of 29   Document 83

isn't. Haertle's complaint specifically alleges that at all relevant times BIG Acquisitions, LLC was acting as an agent for Brennan. (ECF Nos. 1, ¶ 20; 60, ¶ 20.) Brennan admitted that that allegation was true. That fact having thus been established, Haertle cannot now be heard to contend that somehow there is a factual dispute regarding it.

Moreover, when the agent is attempting to enter into a contract on the principal's behalf, the agent is merely a proxy for the principal. *In re Guardianship of Muriel K.*, 2002 WI 27, ¶ 25, 251 Wis. 2d 10, 26, 640 N.W.2d 773, 779 ("It is, accordingly, a consequence of the [agency] relationship that whatever an agent does in the lawful prosecution of the transaction entrusted to him is the act of the principal.") (quoting 3 Am.Jur.2d *Agency* § 1 (1986)). Haertle's claim essentially alleges that Brennan interfered with its own prospective contract. And that a party cannot do. *See Joseph P. Caulfield & Associates, Inc. v. Litho Prods. Inc.*, 155 F.3d 883, 889 (7th Cir. 1998) ("a party cannot interfere tortiously with its own contract") (citing *Wasau Med. Ctr. v. Asplund*, 182 Wis. 2d 274, 514 N.W.2d 34, 44 (1994)). Therefore, Brennan's motion for summary judgment as to Count 6 shall be **granted.**

### D. Punitive Damages

"[T]he general rule in Wisconsin is that there can be no punitive damages without compensatory damages." *C & A Invs. v. Kelly*, 2010 WI App 151, ¶ 10, 330 Wis. 2d 223, 229, 792 N.W.2d 644, 647; *see also Tucker v. Marcus*, 142 Wis. 2d 425, 439, 418 N.W.2d 818, 823 (1988) ("A general and perhaps almost universally accepted rule is that

punitive damages cannot be awarded in the absence of actual damage"). Because no other, independent bases exists for Haertle to recover actual damages, Brennan's motion for summary judgment as to Count 7 shall be **granted.**

### E. Corporate Veil-piercing Claim

Since there are no remaining causes of action, Haertle's claim to pierce BIG Acquisition's corporate veil cannot be sustained as a stand-alone claim. *See Eberts v. Torge & Svetlana Goderstad*, No. 05-C-527, 2008 WL 123594, at \*2 (E.D. Wis. Jan. 10, 2008) Therefore, Brennan's motion for summary judgment on Count 8 is **granted.**

**IT IS THEREFORE ORDERED** that the motion for summary judgment (ECF No. 63) shall be **granted**. This action is hereby **dismissed**, with prejudice. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 8th day of March, 2017.

WILLIAM E. DUFFIN
U.S. Magistrate Judge